# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*International Profit Associates, Inc. v. Linus Alarm Corp.*, 2012 IL App (2d) 110958

| | |
|---|---|
| Appellate Court Caption | INTERNATIONAL PROFIT ASSOCIATES, INC., and INTERNATIONAL TAX ADVISORS, INC., Plaintiffs and Counterdefendants-Appellees, v. LINUS ALARM CORPORATION, Defendant and Counterplaintiff-Appellant. |
| District & No. | Second District<br>Docket No. 2-11-0958 |
| Filed | June 20, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court properly dismissed defendant's counterclaim alleging violations of the Consumer Fraud and Deceptive Business Practices Act on the grounds that the circumstances relating to plaintiffs' allegedly fraudulent activities occurred in Florida, not Illinois, and that the choice-of-law and forum-selection clauses in the parties' contracts making Illinois the chosen forum did not automatically allow defendant to bring its action in Illinois. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 10-L-647; the Hon. David M. Hall, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Robert S. Reda, of Reda & Des Jardins, Ltd., of Lake Forest, for appellant. |
|---|---|
| | Ronald L. Bell, of Ronald L. Bell & Associates, P.C., of Buffalo Grove, for appellees. |

| Panel | JUSTICE BOWMAN delivered the judgment of the court, with opinion. Justices Burke and Birkett concurred in the judgment and opinion. |
|---|---|

## OPINION

¶ 1    Defendant, Linus Alarm Corporation, appeals from the dismissal of two counts of its counterclaim against plaintiffs, International Profit Associates, Inc. (IPA), and International Tax Advisors, Inc. (ITA). The counts alleged claims based on the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act or Act) (815 ILCS 505/1 *et seq.* (West 2010)). Plaintiffs argued that under *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 187 (2005), the Consumer Fraud Act is inapplicable to a non-Illinois resident who engaged in acts that occurred outside of Illinois, and the contracts here were entered into and performed in Florida. Defendant argued that contractual choice-of-law and forum-selection clauses required application of Illinois law, including the Consumer Fraud Act, regardless of any territorial limitations within the Act. Defendant alternatively argued that the transactions at issue occurred primarily and substantially in Illinois. The trial court granted plaintiffs' motion to dismiss, and we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    Plaintiffs brought a five-count complaint against defendant on July 14, 2010. They filed an amended complaint on November 3, 2010, that alleged as follows. On October 1, 2009, defendant entered into written contracts with plaintiffs for consulting work. Plaintiffs performed their duties under the contracts, but defendant had not paid them all of the monies due. Specifically, IPA billed defendant for $82,375.92 but was still owed $46,343.91 of that amount. ITA billed defendant for $16,274.74 but was still owed $10,333. Plaintiffs alleged claims of breach of contract and fraud.

¶ 4    Defendant filed a counterclaim in November 2010 and an amended counterclaim on February 7, 2011. It alleged breach of contract; fraudulent inducement; and two claims under the Consumer Fraud Act. Count IV, one of the claims under the Act, alleged as follows in relevant part. On September 9, 2009, an IPA telemarketer called defendant and spoke with its president, Michael Mazzuco. Mazzuco told the telemarketer that defendant could not

afford any services from IPA, because it had laid off many employees. On September 23 and 30, 2009, an Illinois IPA salesman, Christopher Angelo, met with Mazzuco. Angelo told him that a "Business Analysis" would provide an in-depth analysis of defendant's business and would cost $450. In reliance on Angelo's representations and the benefits advertised in the Business Analysis brochure, defendant entered into an "Analysis Contract" with IPA. However, IPA's statements in its Analysis Contract, various brochures, and certain training manuals were false because, as indicated in the "IPA Survey Training Manual," the sole purpose of the Business Analysis was to sell IPA's and ITA's consulting services. That is, the "Business Analysis [was] not designed and taught to 'conduct a comprehensive analysis' of IPA clients['] businesses as advertised and contracted." Instead, IPA trained its analysts to be salesmen for its consulting services. IPA intended its false statements of material fact to induce defendant to enter into the Analysis Contract, because IPA intentionally printed and distributed advertisements and contracts touting the benefits of its Business Analysis while at the same time training its business analysts/salesmen not to perform the Business Analysis. Defendant relied on numerous false statements of material fact in entering into the Analysis Contract, in giving IPA's analyst (Dan Light) access to its business records, and in giving Light control over its employees' time. Defendant sought damages of $450 plus the loss of the value of its employees' time, attorney fees and costs, and prejudgment interest. Defendant also sought injunctive relief against IPA.

¶ 5        In count V of the amended counterclaim, which also sought relief under the Consumer Fraud Act, defendant alleged as follows. While Light was allegedly performing the Analysis Contract on October 1, 2009, Mazzuco told him that he was heartbroken about having to lay off 14 employees over the last 24 months because of a drop in sales. Light told Mazzuco that he knew a way to get the employees back to work. Light also created an immediate " 'crisis' " by telling Mazzuco that defendant was going out of business within three months and that Mazzuco's other company would also be liable. Light further stated that: IPA had jobs in Iraq and Afghanistan that it could award to defendant if defendant's books were prepared to meet governmental regulations, which IPA consultants could do; IPA controlled some government grants and had stimulus money to help qualified small businesses; defendant was paying too much in taxes and ITA "could make it so [defendant] would not have to pay taxes"; IPA guaranteed a three-to-one return on its consulting services; and defendant would not have to pay if it did not have the money. Based on these representations, defendant entered into a contract with IPA for consulting services (the Consulting Agreement). From October 5 to 22, 2009, IPA's consultant John Moreau told Mazzuco and other employees that he was working on defendant's Quickbooks and accounting. During this same time, IPA's consultant Tracy Hausman told Mazzuco that he was working on a proposal to raise money through the American Recovery and Reinvestment Act, the Small Business Administration, and other sources. During this time, IPA charged defendant $82,375.92 for its consulting services, of which defendant paid $49,237.25. After IPA's consultants left, defendant discovered that no work had been done to its Quickbooks or accounting systems, that the proposal falsely inflated defendant's annual sales figures, and that IPA did not control any overseas contracts, government grants, or stimulus money. IPA intended its false statements of material fact to induce defendant to enter into the Consulting

Agreement, and defendant relied on these statements in signing the contract and in giving IPA access to its business records and control over its employees' time. Defendant sought damages of the $49,237.25 it had paid IPA under the Consulting Agreement, the value of defendant's employees' time, injunctive relief, attorney fees and costs, and prejudgment interest.

¶ 6    On March 10, 2011, plaintiffs filed a motion under section 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2010)) to dismiss the aforementioned counterclaims (counts IV and V). Plaintiffs argued that under *Avery*, 216 Ill. 2d at 187, the Consumer Fraud Act does not apply to a non-Illinois resident who engaged in acts occurring outside of Illinois, and the contracts at issue here were entered into and performed in Florida.

¶ 7    On May 25, 2011, the trial court granted plaintiffs' motion to dismiss counts IV and V. On June 22, 2011, defendant filed a motion requesting a finding under Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010). The trial court granted the motion on August 24, 2011. Defendant timely appealed.

¶ 8                                      II. ANALYSIS

¶ 9    On appeal, defendant challenges the dismissal of counts IV and V of its amended counterclaim. Plaintiffs' motion to dismiss was brought pursuant to section 2-619(a)(9) of the Code. A section 2-619 motion admits the legal sufficiency of a claim but asserts certain external defects or defenses that defeat the claim. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579 (2006). In reviewing the grant of a section 2-619 motion, we must interpret the pleadings and supporting documents in the light most favorable to the party bringing the action. *Snyder v. Heidelberger*, 2011 IL 111052, ¶ 8. A section 2-619 dismissal resembles the grant of a motion for summary judgment; we must determine whether a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether the dismissal was proper as a matter of law. *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 254 (2004). We review *de novo* the grant of a motion to dismiss under section 2-619. *Sheffler v. Commonwealth Edison Co.*, 2011 IL 110166, ¶ 23.

¶ 10   In their section 2-619 motion, plaintiffs sought dismissal of defendant's claims that alleged violations of the Consumer Fraud Act. To establish a claim under the Act, a party must prove: (1) a deceptive act or practice; (2) the opponent intended that the party rely on the deception; (3) the deception took place in a course of conduct involving trade or commerce; and (4) actual damages (5) the deception caused. *De Bouse v. Bayer AG*, 235 Ill. 2d 544, 550 (2009). Plaintiffs argued that defendant's claims failed because the contracts were entered into and performed in Florida, and, under *Avery*, the Act does not apply to acts that occurred outside of this state.

¶ 11   In *Avery*, our supreme court held that consumer fraud claims may not be based only on a breach of a contractual promise. *Avery*, 216 Ill. 2d at 168-70. Otherwise, any breach-of-contract suit could be converted into a consumer fraud action, making the latter a redundant remedy. *Id.* at 169. The supreme court also held that the Consumer Fraud Act does not have extraterritorial effect, in that the legislature did not intend for the Act to apply to fraudulent

-4-

transactions that take place outside Illinois. *Id.* at 185. In determining whether transactions took place within this state, the court held that a nonresident plaintiff "may pursue a private cause of action under the Consumer Fraud Act if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Id.* at 187. The court stated that where a company policy is created or where a form document is drafted may be relevant factors to consider in determining the location of a consumer transaction, as is where the injury or deception took place, but these are just some of the relevant circumstances. *Id.* at 186-87.

¶ 12    The plaintiffs in *Avery* had brought a class action suit against State Farm regarding its alleged undisclosed practice of using inferior replacement parts for vehicles damaged in crashes. *Id.* at 110. Our supreme court concluded that the out-of-state plaintiffs did not have a cognizable cause of action under the Consumer Fraud Act. Using the named plaintiff as an example, the supreme court stated that his car was garaged in Louisiana; the accident occurred there; his estimate was written in Louisiana and he received a " 'Quality Replacement Parts' " brochure there; the alleged deception of failing to disclose the parts' inferiority occurred in Louisiana; his contact with State Farm was through a Louisiana agent, a Louisiana claims representative, and a Louisiana adjuster; and there was no evidence that the plaintiff ever met or talked with any Illinois State Farm employee. *Id.* at 188. The supreme court stated that the overwhelming majority of the circumstances that related to the named plaintiff's and the other out-of-state plaintiffs' insurance claims, which were the disputed transactions in the case, occurred outside of Illinois. *Id.*

¶ 13    The *Avery* court distinguished *Martin v. Heinold Commodities, Inc.*, 117 Ill. 2d 67 (1987). In *Martin*, the nationwide plaintiffs brought a class action suit against a commodities broker, alleging that it had breached its fiduciary duty toward them by concealing substantial additional commissions. *Id.* at 70-71. Two of the counts alleged violations of the Consumer Fraud Act. *Id.* at 71. The supreme court held that the certification of the plaintiff class was proper because there were common issues of fact and Illinois substantive law could be applied to resolve the dispute. *Id.* at 82. The court stated that the application of Illinois law complied with procedural due process because each class member's claim implicated Illinois's interests. Specifically, the broker's principal place of business was in Illinois and this fact was "made manifest" to the class members in the following ways: (1) payments were remitted to the broker's Chicago office; (2) all complaints were directed to that office; (3) Illinois law governed the parties' agreement; (4) all legal disputes were to be adjudicated in Illinois courts or federal courts in Illinois; and (5) the agreement establishing the agency relationship was binding only upon its receipt and approval by the broker at its Chicago office. *Id.* at 82-83.

¶ 14    *Avery* stated that *Martin* was distinguishable because *Martin* considered only whether the class certification comported with certain due process principles. It did not address the Consumer Fraud Act's scope as a matter of statutory interpretation, because "that issue simply was not presented." *Avery*, 216 Ill. 2d at 189. The *Avery* court further stated that, to the "extent that [*Martin* was] relevant," it was distinguishable because there were "virtually no circumstances relating to the disputed claims practices at issue in [*Avery*] which occurred or existed in Illinois for those plaintiffs who are not Illinois residents." *Id.* The court stated

that a singular finding that a scheme to defraud was disseminated from Illinois headquarters was insufficient to support a claim under the Consumer Fraud Act. *Id.*

¶ 15    Defendant argues that this case is distinguishable from *Avery* because plaintiffs' consulting contracts had choice-of-law and forum-selection clauses that mandate Illinois as the forum for disputes and mandate the application of Illinois law. Defendant argues that it would be "unusual" for plaintiffs to require in their form contracts that disputes be heard in Illinois under Illinois law and at the same time argue that Illinois's Consumer Fraud Act is inapplicable because of an "alleged extraterritorial exception that [defendant] could not have known about."

¶ 16    Defendant cites references to *Avery* and *Martin* in *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 70 (2007). *Barbara's Sales* involved a class action suit consisting of nationwide plaintiffs. *Id.* at 47. The plaintiffs argued that, under *Martin*, California law should be applied to the case, because the defendant's representation "emanated" from there. *Id.* at 70. The supreme court distinguished the *Martin* decision as specifically based on certain key factors, those being the five previously recited factors " 'manifest[ing]' " to each class member that the defendant's place of business was in Illinois. *Id.* In contrast, in the case before it, only the defendant's headquarters was in California. *Id.* at 71. The *Barbara's Sales* court determined that Illinois law applied. It further held that the trial court was correct to limit the class to Illinois consumers because, under *Avery*, the Consumer Fraud Act applies only to transactions that primarily and substantially occur in Illinois. *Id.*

¶ 17    Defendant further cites *Hall v. Sprint Spectrum L.P.*, 376 Ill. App. 3d 822 (2007). There, the plaintiff filed a lawsuit against Sprint on behalf of a nationwide class of customers. *Id.* at 822-23. The trial court certified the class and ruled that Kansas law applied based on an express choice-of-law provision in Sprint's form contract. *Id.* at 824. On appeal, Sprint argued that a class certification based on the application of the Kansas Consumer Protection Act was improper because the Kansas act, like the Illinois Consumer Fraud Act, could not be applied extraterritorially. *Id.* at 825-27. The appellate court disagreed, stating that the case was distinguishable from *Avery* because there the plaintiff sought extraterritorial application of the statute based on the statute's terms, whereas here the trial court enforced a voluntary and broadly worded choice-of-law provision in an adhesion contract that Sprint drafted. *Id.* at 825. The court continued:

> "[T]he issue is not the territorial application of the Kansas Consumer Protection Act but whether the parties chose to apply Kansas law to govern the validity of the provisions in their contract. The fact that Kansas law might not otherwise apply is irrelevant because the parties expressly agreed that Kansas law would apply." *Id.* at 827.

In support, the court cited *Davis v. Miller*, 7 P.3d 1223, 1229 (Kan. 2000) (parties could incorporate and bind themselves to a premarital act in their postmarital agreement, even though the premarital act was not intended to apply to postmarital agreements), and *Bartlett Bank & Trust Co. v. McJunkins*, 147 Ill. App. 3d 52, 59 (1986) (parties could incorporate Uniform Commercial Code into their agreement, even if it would otherwise be inapplicable). *Hall*, 376 Ill. App. 3d at 827.

¶ 18    In response to Sprint's argument that the choice-of-law provision should not apply to it,

because the plaintiff's claims were " 'noncontractual,' " the *Hall* court stated that the different claims "do not reflect differing sources of the law so much as alternative theories whereby she and other class members can bring an action to enforce the same underlying legal principle that comes from contract law, not tort law." *Id.* The court stated that, before *Avery*, Illinois courts "traditionally held" that the consumer protection law of the state designated in a choice-of-law provision would apply. *Id.* at 827-28. As an example, the court cited *Potomac Leasing Co. v. Chuck's Pub, Inc.*, 156 Ill. App. 3d 755, 757-60 (1987) (where parties' contract had a choice-of-law provision designating Michigan law, that state's law would be applied, even though its consumer protection law did not have a notice of cancellation provision, as did the Illinois Consumer Fraud Act). The *Hall* court noted that the appellate court in *Barbara's Sales, Inc. v. Intel Corp.*, 367 Ill. App. 3d 1013, 1021 (2006), stated that *Avery* did not change choice-of-law precedent. *Hall*, 376 Ill. App. 3d at 829. The *Hall* court concluded that the trial court correctly found that "the parties bound themselves to the provisions of the Kansas Consumer Protection Act by incorporating the express choice-of-law provision in their enforceable contract." *Id.* at 827.

¶ 19     Plaintiffs respond that under *Avery* a choice-of-law clause is not dispositive, because a claim under the Consumer Fraud Act is independent of contract. Plaintiffs further argue that *Hall* misinterpreted *Davis* and *Bartlett* in arriving at its conclusion that Kansas's Consumer Protection Act applied notwithstanding its territorial limitation. Plaintiffs argue that in *Davis* and *Bartlett* the parties were bound by otherwise inapplicable statutes because they specifically referred to those statutes in their contracts. Plaintiffs argue that the Consulting Agreement did not indicate that the Consumer Fraud Act would apply, while the Analysis Contract did not even contain a forum-selection clause. Plaintiffs maintain that the importance of the forum-selection clause in this case is *de minimis* and that the overwhelming majority of facts reflect that the transactions at issue occurred primarily and substantially in Florida.

¶ 20     The broader question the instant case raises is whether parties' contractual choice-of-law provisions trump statutory territorial limitations. Several federal appellate courts have examined this issue in connection with other types of statutes and determined that the territorial restrictions still apply.[1] For example, in *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376 (7th Cir. 2003), some non-Illinois dealerships brought suit against Volvo, alleging breach of dealership agreements. The contracts provided for the application of Illinois law. *Id.* at 383. The dealers sought to apply the Illinois Franchise Dealership Act, which by its own terms is limited to Illinois franchises. *Id.* at 385. The Seventh Circuit discussed several cases holding that a state's territorial limitations apply even where a choice-of-law provision invokes that state's law, and it agreed with this outcome. *Id.* at 385-86. The court stated that, if Illinois law applies by virtue of the parties' contract, then the court must look to the scope of Illinois law to determine the scope of application. Therefore, because the Illinois Franchise Dealership Act limited its scope to franchises within Illinois,

---

[1]While we are not required to follow the decisions of federal courts other than the United States Supreme Court, decisions of lower federal courts can serve as persuasive authority and provide guidance. *People v. Wheat*, 383 Ill. App. 3d 234, 239 (2008).

-7-

the dealers could not claim its protections. *Id.* at 386; see also *Gravquick A/S v. Trimble Navigation International Ltd.*, 323 F.3d 1219, 1223 (9th Cir. 2003) (where a state law does not have geographical limits on its scope, courts will apply it to contracts governed by that state's law, but if a state law has geographical limits on its application, courts will not apply it to parties falling outside of those limits, even though the parties had stipulated that the law should apply); *Highway Equipment Co. v. Caterpillar Inc.*, 908 F.2d 60, 62-64 (6th Cir. 1990) (Illinois Franchise Dealership Act was intended to protect only Illinois residents and did not apply extraterritorially even where the contract required the application of Illinois law); *Peugeot Motors of America, Inc. v. Eastern Auto Distributors, Inc.*, 892 F.2d 355, 358 (4th Cir. 1989) (New York regulatory acts with explicit geographical limitations did not apply to out-of-state parties, even though the parties' contract called for the application of New York law).

¶ 21    While we express no opinion on whether statutory territorial limitations will always control over contractual choice-of-law provisions, we believe that the reasoning of *Cromeens* and the other federal appellate decisions cited is especially suited for actions under the Consumer Fraud Act. *Avery* holds that the Consumer Fraud Act has a territorial limitation in that it applies only to transactions that occur primarily and substantially in Illinois. *Avery*, 216 Ill. 2d at 187. *Avery* also holds that a consumer fraud claim may not be based on breach of contract. *Id.* at 168-70. Particularly in a situation such as this one, where an action under the Act must be based *outside of contract*, it does not make sense to have a *contractual* choice-of-law provision *automatically* prevail over a statutory territorial limitation.

¶ 22    We find without merit defendant's reliance on *Martin* for the proposition that choice-of-law and forum-selection clauses in the contracts alone mandate application of the Consumer Fraud Act. *Martin* stated that the fact that the broker's principal place of business was in Illinois was manifested to class members in several ways, including that Illinois law governed the parties' agreement and that legal disputes were to be adjudicated in Illinois (*Martin*, 117 Ill. 2d at 82-83); *Martin* did not hold that these two factors alone were dispositive. Moreover, *Avery* distinguished *Martin* on the basis that *Martin* considered only whether the class certification satisfied certain due process principles and was not presented with the issue of the Consumer Fraud Act's scope as a matter of statutory interpretation.

¶ 23    *Hall*, in contrast, supports defendant's position, but we disagree with its reasoning that a contractual choice-of-law provision will always take priority over a statutory territorial limitation in a consumer fraud act. The cases *Hall* relied upon, *Davis* and *Bartlett*, were grounded in contract, but, as stated, a claim under the Consumer Fraud Act cannot be based on contract. *Avery*, 216 Ill. 2d at 168-70. In response to the argument that fraud claims are not contractual, the *Hall* court stated that the plaintiff was bringing an action to enforce legal principles that come from contract law, rather than tort law. *Hall*, 376 Ill. App. 3d at 827. However, *Avery* specifically cautioned that the Consumer Fraud Act was not intended to be a redundant remedy to a contract action. *Avery*, 216 Ill. 2d at 169. Further, the *Hall* court relied on *Potomac Leasing Co.*, 156 Ill. App. 3d at 757-60, in stating that the consumer protection law of the designated state will apply if there is an express choice-of-law provision (*Hall*, 376 Ill. App. 3d at 828), but *Potomac Leasing Co.* made no such sweeping statement. That case did find that Michigan law applied, but the issue of any statutory territorial

limitations was not raised or considered. *Hall* also cited the appellate court's decision in *Barbara's Sales* for the proposition that *Avery* did not change choice-of-law precedent. However, in *Barbara's Sales* our supreme court reiterated that the trial court was correct to limit the class to Illinois consumers because, under *Avery*, the Consumer Fraud Act applies only to transactions that primarily and substantially occur in Illinois. *Barbara's Sales*, 227 Ill. 2d at 71. In sum, *Hall* does not provide a persuasive analysis, and we decline to follow it.

¶ 24 Our conclusion that choice-of-law and forum-selection provisions will not automatically mandate the application of the Consumer Fraud Act is consistent with the Seventh Circuit's recent holding on this precise issue. In *Morrison v. YTB International, Inc.*, 649 F.3d 533, 537 (7th Cir. 2011), the parties' contract provided for litigation to take place in Illinois under Illinois law. The Seventh Circuit stated, "*Avery* holds that a choice-of-law clause is not dispositive, because a claim under the Consumer Fraud Act is independent of the contract [citation], but *Martin* says that it is nonetheless a mark in plaintiffs' favor." *Id.*; see also *Shaw v. Hyatt International Corp.*, No. 05 C 022, 2005 WL 3088438, at *3 (N.D. Ill. Nov. 15, 2005) (a choice-of-law clause specifying Illinois law did not require application of the Consumer Fraud Act, because the Act is limited to deceptive trade practices occurring primarily and substantially in Illinois, and the fact that Illinois law was selected to govern disputes did not further the contention that the allegedly deceptive practices occurred in Illinois).

¶ 25 Defendant alternatively argues that, even if the choice-of-law and forum-selection clauses do not automatically require application of the Consumer Fraud Act, the Act still applies because the facts giving rise to the relevant claims occurred primarily and substantially in Illinois. Defendant cites the following factors: IPA's contract contains choice-of-law and forum-selection clauses specifying that any litigation would be conducted in Illinois, under Illinois law; IPA initiated the lawsuit against defendant in Illinois; IPA's place of business is in Buffalo Grove, Illinois, and IPA has no offices in Florida; every IPA employee involved in the transactions is headquartered at, trained at, and paid through IPA's Illinois offices; all of IPA's employees are supervised by personnel from the Illinois headquarters; IPA's customer relations department is in its Illinois headquarters; all of IPA's correspondences emanate from its Illinois headquarters; invoices for services rendered are generated from headquarters, and IPA is paid through headquarters; IPA's disputed billing and collection practices are conducted from headquarters; and the "performance of IPA's Tax Services are supervised from and conducted with the assistance and input from supervisors located in IPA's Illinois office." Defendant argues that IPA has no offices in any other state, its entire operation is based in Illinois, and everything it does emanates from and returns to Illinois. Defendant argues that, therefore, IPA's actions occurred primarily and substantially in Illinois.

¶ 26 Defendant cites *IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.*, No. 04 C 6504, 2007 WL 164603 (N.D. Ill. Jan. 12, 2007). There, the defendant, a New Jersey company, entered into a lease for telecommunications equipment with NorVergence, Inc., a company whose main offices were in New Jersey. NorVergence assigned the lease to the plaintiff, an Illinois corporation with its principal place of business in Illinois. The plaintiff

brought suit against the defendant for failing to make the required lease payments. The defendant filed a counterclaim, alleging, among other things, consumer fraud under the Act. *Id.* at *1. The plaintiff relied on *Avery* in arguing that the Act did not apply, because the fraudulent transactions took place outside of Illinois. The federal district court stated that *Avery* used the following factors to guide the analysis of whether a transaction occurred primarily and substantially in Illinois: (1) the plaintiff's residence; (2) the location of the deception; (3) where the plaintiff's damages occurred; and (4) whether the plaintiff communicated with the defendant or its agents in Illinois. *Id.* at *3. The district court determined that the alleged fraud underlying the dispute primarily and substantially occurred in Illinois. It reasoned that, although the defendant and NorVergence were in New Jersey, the defendant alleged that "a Master Program Agreement was in place to provide the assignment of the Agreement that was executed and performed in Illinois and that was governed by and is to be construed and enforced under Illinois law." *Id.* Also, the assignment of the defendant's agreement to the plaintiff took place in Illinois, and the defendant's damages arose, in part, from the plaintiff's Illinois suit against it to collect on the lease. *Id.*

¶ 27        Plaintiffs argue that the overwhelming majority of circumstances related to the Consumer Fraud Act claims occurred in Florida. Plaintiffs cite the following factors: defendant's president, Mazzuco, was visited by IPA's sales manager, Angelo, a Florida resident, at defendant's offices in Florida; defendant claims that a brochure given to him at the meeting and misstatements Angelo made to him at that time fraudulently induced Mazzuco to sign the Analysis Contract; IPA analyst Light went to defendant's offices in Florida, and the contracted business analysis was conducted there; based on Mazzuco's reliance on Light's statements in Florida at the completion of the business analysis, Mazzuco agreed to enter into the Consulting Agreement; the agreements for consulting services of both IPA and ITA were presented and executed in Florida; prior to beginning the consulting, plaintiffs and defendant prepared and signed a "Value Enhancement Program" at defendant's Florida offices, outlining the objectives and scope of the consulting engagement; plaintiffs' consulting services were conducted at defendant's Florida offices; at the end of each of the four consulting weeks, Mazzuco signed a review that purported to convey his continual satisfaction with the work performed; all IPA invoices were accepted and signed by Mazzuco in Florida; and all payments tendered to IPA were accepted by IPA's consultants at defendant's offices in Florida.

¶ 28        Plaintiffs cite *Landau v. CNA Financial Corp.*, 381 Ill. App. 3d 61, 63 (2008). There, the plaintiff argued that Illinois had the necessary connections to the transaction at issue to allow her to bring suit in Illinois under the Act. She argued that the defendant did the following acts in Illinois: created and designed the insurance policy at issue; adopted improper actuarial assumptions; created a false and misleading sales and marketing program; disseminated false and misleading marketing materials; trained agents on the sales materials; decided to raise premium rates; reviewed the application form she had completed; consummated the transaction in which she purchased the policy by accepting and approving it; accepted the initial premium payment; issued the policy; and instructed the plaintiff to send future premium payments to headquarters in Illinois. *Id.* at 64-65. The appellate court stated that "[m]ost of these circumstances are activities that occur routinely in corporate headquarters,"

and under *Avery* the "issuance of the allegedly fraudulent policy from the state whose laws the party seeks to invoke is not dispositive." *Id.* at 65. The court stated that the majority of the circumstances relating to the alleged violation of the Consumer Fraud Act occurred outside of Illinois, in that: the plaintiff was a resident of Pennsylvania and bought her policy there; her contact with company representatives occurred only in Pennsylvania; she never spoke to Illinois representatives about her policy; and the alleged deceptive communication occurred in Pennsylvania, without additional communication from Illinois. *Id.* at 64-65.

¶ 29 Our supreme court stated in *Avery* that there is no bright-line test or formula in determining whether a disputed transaction occurred within Illinois. *Avery*, 216 Ill. 2d at 187. Instead, each case must be decided on its own facts, with the "critical question" being whether the circumstances relating to the disputed transactions occurred primarily and substantially in Illinois. *Id.* Here, as in *Landau*, the majority of the circumstances that defendant cites as occurring in Illinois, such as employee training, the drafting of contracts, correspondence, and payment practices, "are activities that occur routinely in corporate headquarters" and are not, standing alone, dispositive. *Landau*, 381 Ill. App. 3d at 65; see also *Avery*, 216 Ill. 2d at 189 (Consumer Fraud Act does not apply where only connection with Illinois is that the party's headquarters are in this state or that the scheme to defraud originated here). Still, that plaintiffs' headquarters are here can be considered as a factor, as is the fact that the Consulting Agreement had choice-of-law and forum-selection clauses choosing Illinois. See *Morrison*, 649 F.3d at 537.

¶ 30 That said, we agree with plaintiffs' argument that the majority of circumstances relating to defendant's Consumer Fraud Act claims occurred in Florida. Regarding count IV, defendant allegedly relied on an IPA employee's false representations that were made to him in Florida and on deceptive materials given to him in Florida. Mazzuco signed the Analysis Contract in Florida, and the actual analysis took place there by IPA analyst Light, who was physically present. As plaintiffs also point out, the Analysis Contract did not have choice-of-law and forum-selection clauses. Given these factors, it is clear that the circumstances related to count IV did not occur primarily and substantially in Illinois.

¶ 31 As for count V, defendant alleged that it signed the Consulting Agreement based on its reliance on the numerous false representations Light made while performing the Analysis Contract. These false representations were therefore all made in Florida. The Consulting Agreement was also signed in Florida, and the "Value Enhancement Program," which discussed the scope and objectives for the consulting project, was drafted and signed in Florida. Defendant further alleged that IPA employees Moreau and Hausman, who performed the consulting work, gave him false information; these false representations also occurred in Florida. The circumstances in count V arguably are more balanced than those in count IV because of the choice-of-law and forum-selection clauses. However, given that the alleged deception and injury took place in Florida, the majority of relevant facts relating to count V cannot be said to have taken place primarily and substantially in Illinois.

¶ 32 Our result is consistent with the case cited by defendant, *IFC Credit Corp.*, 2007 WL 164603. Using the factors cited there, the claimant's residence is in Florida, the location of the deception was in Florida, the damages sought in the counterclaim occurred in Florida, and almost all of the communication related to the fraud claims occurred in Florida. The *IFC*

-11-

*Credit Corp.* court found that the alleged fraud there primarily and substantially occurred in Illinois because, in addition to a choice-of-law clause, the plaintiff had a "Master Program Agreement" with NorVergence that was executed and performed in Illinois, and the actual assignment of the defendant's agreement to the plaintiff took place in Illinois. *Id.* at *3. Here, in contrast, no such significant events directly relating to the alleged fraud took place in Illinois.

¶ 33 In sum, the choice-of-law and forum-selection clauses in the parties' contracts do not automatically allow defendant to bring suit under the Consumer Fraud Act. Instead, under *Avery*, defendant must show that the circumstances relating to the alleged fraud occurred primarily and substantially in Illinois. However, as we have concluded that most of these circumstances occurred in Florida rather than Illinois, the Act does not apply, and the trial court correctly granted plaintiffs' motion to dismiss.

¶ 34                                                III. CONCLUSION

¶ 35 For the foregoing reasons, we affirm the judgment of the Lake County circuit court.

¶ 36 Affirmed.